UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EDMOND PAUL PRICE,                    )        No. CV 14-6307-AGR
                                      )
              Petitioner,             )
                                      )
      v.                              )        OPINION AND ORDER ON
                                      )        PETITION FOR WRIT OF
AMY MILLER, Warden,                   )        HABEAS CORPUS
                                      )
              Respondent.             )
                                      )

      Petitioner filed a petition for writ of habeas corpus.  Respondent filed an answer
and Petitioner filed a reply.[1]  The matter was taken under submission.

## I.

## SUMMARY OF PROCEEDINGS

      On October 22, 2010, a San Luis Obispo County jury found Petitioner guilty of
seven counts of check forgery or counterfeiting and found true that Petitioner had
committed felonies while on bail.  (Lodged Document ("LD") 17 at 158-61, 164-67.)
Petitioner was sentenced to 10 years, 4 months in prison.  (LD 17 at 284.)

---

      [1]  The parties consented to proceed before a magistrate judge.  (Dkt. Nos. 2, 13,
16.)

On May 7, 2012, the California Court of Appeal affirmed the judgment with modifications as to restitution, fees, and conduct credits. *People v. Price*, 2012 Cal. App. Unpub. LEXIS 3433 (May 7, 2012).  On July 18, 2012, the California Supreme Court denied review. *People v. Price*, 2012 Cal. LEXIS 7034 (July 18, 2012).

On January 3, 2013, the Superior Court denied a state habeas petition. (LD 7.)  On August 19, 2013, the California Court of Appeal denied a habeas petition. (LD 9.)  On February 11, 2014, the California Supreme Court denied a habeas petition. (LD 11.)

**II.**

**STATEMENT OF FACTS**

The California Court of Appeal set forth the following facts on direct appeal.  To the extent that an evaluation of Petitioner's claims depends on an examination of the record, the Court has made an independent evaluation of the record specific to Petitioner's claims.

*South County Checks*

Deborah Love was executive director of the South County Family Educational and Cultural Center (South County).  Only she was authorized to write checks on South County's accounts.  Love did not know Price and did not authorize any checks payable to him.  On November 30, 2009, Love was notified that some South County checks had been stolen during a burglary.

The Pocketbook Market had a check cashing service.  On December 18, 2009, the market cashed a South County check for Price in the amount of $1,080.57.  Later that afternoon, an employee of the market learned the check contained a nonexistent address.  On January 14, 2010, Price returned to the market and tried to cash two more South County checks.  The employee took the checks, told Price they were forged, and called the police.  Price left the market.

The Carniceria La Meza Market also had a check cashing service. In early January 2010, Price cashed four South County checks at the market. The amounts ranged from $538.17 to $981.19. Market employees later learned the checks were not good. On January 14, 2010, Price returned to the market and tried to cash two more South County checks. He was told to return the next day. When Price returned the next day, the police arrested him. The police advised him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and Price agreed to talk. Price admitted to the police that he received the checks from someone he should not have been involved with, and that the checks were "criminal in nature." Price said, "if you keep up this type of activity, eventually you will be arrested." Price did not want to talk further.

*Rovenstine Roofing Checks*

While out on bail, on June 21, 2010, Price deposited a check at a Coast National Bank branch and received $300 in cash back. The check was drawn on the account of Rovenstine Roofing. A day later, the teller who deposited the check learned it was fraudulent.

On June 22, 2010, Price deposited another check drawn on Rovenstine Roofing's account at a different branch of Coast National Bank. He received $747 in cash back. A bank employee knew the owner of Rovenstine Roofing. She noticed the signature on the check was not that of the owner. She called the owner and verified that the check was fraudulent.

On the same day, Price attempted to deposit another Rovenstine Roofing check at another branch of the same bank. He wanted to receive the majority of the money in cash back. A bank employee was aware of what had been happening at other branches. A bank

1    supervisor called the police and Price was arrested.

2    DEFENSE

3          Michael Fleming was released from prison on May 15, 2010.

4    Shortly thereafter Price loaned Fleming $5,000.  About a month later,

5    Price told Fleming he needed the loan repaid.  Fleming gave Price three

6    forged checks bearing the name Rovenstine Roofing for $947.63 each.

7    Fleming got the name Rovenstine Roofing from the telephone book, but

8    he told Price he worked for the company.  Fleming did not tell Price the

9    checks were forged.  Price asked Fleming, "Are [the checks] going to

10   clear?"  Fleming replied, "Yes, they are going to clear.  They have a

11   correct account number."

12         Fleming testified the $5,000 loan was not for an illegal purpose.

13   He and his wife have a daughter, and his wife was pregnant with their

14   son.  They were living in a hotel.  He needed the loan to improve their

15   living situation.

16   *Price*, 2012 Cal. App. Unpub. LEXIS 3433, at *1-*4.

17                                    **III.**

18                          **<u>STANDARD OF REVIEW</u>**

19         A federal court may not grant a petition for writ of habeas corpus by a person in

20   state custody with respect to any claim that was adjudicated on the merits in state court

21   unless it (1) "resulted in a decision that was contrary to, or involved an unreasonable

22   application of, clearly established Federal law, as determined by the Supreme Court of

23   the United States"; or (2) "resulted in a decision that was based on an unreasonable

24   determination of the facts in light of the evidence presented in the State court

25   proceeding."  28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

26         "'[C]learly established Federal law' . . . is the governing legal principle or principles

27   set forth by the Supreme Court at the time the state court rendered its decision."  *Lockyer*

28   *v. Andrade*, 538 U.S. 63, 71-72 (2003); *see Greene v. Fisher*, 565 U.S. 34, 40 (2011)

(examining Supreme Court precedent as of the date of the last state court decision on the merits of the claim).  Clearly established federal law includes only the holdings, as opposed to the dicta, of Supreme Court decisions.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "'confronts a set of facts . . . materially indistinguishable'" from a decision of the Supreme Court but reaches a different result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (citation omitted).  A state court's decision cannot be contrary to clearly established Federal law if there is a "lack of holdings from" the Supreme Court on a particular issue.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced."  *Andrade*, 538 U.S. at 76; *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005) ("An 'unreasonable application' occurs when a state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case.") (citation and some quotation marks omitted).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "The state court's application must have been 'objectively unreasonable.'"  *Id.* at 520-21 (citation omitted).

"Under § 2254(d), a habeas court must determine what arguments or theories supported or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this [Supreme] Court."  *Richter*, 562 U.S. at 102.  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so

1  lacking in justification that there was an error well understood and comprehended in

2  existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

3    "Factual determinations by state courts are presumed correct absent clear and

4  convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the

5  merits in a state court and based on a factual determination will not be overturned on

6  factual grounds unless objectively unreasonable in light of the evidence presented in the

7  state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

8    In applying these standards, this court looks to the last reasoned state court

9  decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).  To the extent no such

10 reasoned opinion exists, as when a state court rejected a claim without explanation, this

11 court must conduct an independent review to determine whether the decisions were

12 contrary to, or involved an unreasonable application of, "clearly established" Supreme

13 Court precedent.  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013); *Haney v. Adams*,

14 641 F.3d 1168, 1171 (9th Cir. 2011).  If the state court declined to decide a federal

15 constitutional claim on the merits, this court must consider that claim under a *de novo*

16 standard of review rather than the more deferential "independent review" of unexplained

17 decisions on the merits.  *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see also Lewis v. Mayle*,

18 391 F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim state

19 court did not reach on the merits).

20 **IV.**

21 **<u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>**

22   The Petition contains five grounds based primarily on ineffective assistance of

23 counsel. Petitioner contends that his counsel was ineffective for (1) making inflammatory

24 remarks that Petitioner received forged checks in exchange for drugs; (2) calling Officer

25 Lopez as a witness at trial; (3) failing to call Petitioner to testify; (4) failing to interview a

26 bank manager and Roger Feldtmose; and (5) failing to object to CALCRIM 3406.

27

28

1 | Petitioner alleges trial court error in connection with subclaims (3) and (5).[2]

2 |       To succeed on a claim of ineffective assistance of counsel, Petitioner must
3 | demonstrate that his attorney's performance was deficient and that the deficiency
4 | prejudiced the defense. *Wiggins*, 539 U.S. at 521; *Strickland v. Washington*, 466 U.S.
5 | 668, 687 (1984). Petitioner bears the burden of establishing both components. *Williams*
6 | *v. Taylor*, 529 U.S. 362, 390-91 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

7 |       "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court
8 | must indulge a strong presumption that counsel's conduct falls within the wide range of
9 | reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009)
10 | (citation omitted). A petitioner "must overcome the presumption that, under the
11 | circumstances, the challenged action 'might be considered sound trial strategy.'"
12 | *Strickland*, 466 U.S. at 689 (citation omitted). "'The proper measure of attorney
13 | performance remains simply reasonableness under prevailing professional norms.'"
14 | *Knowles*, 466 U.S. at 124 (citation omitted). Strickland "calls for an inquiry into the
15 | objective reasonableness of counsel's performance, not counsel's subjective state of
16 | mind." *Richter*, 562 U.S. at 110.

17 |       To establish prejudice, a petitioner must establish a "reasonable probability that,
18 | but for counsel's unprofessional errors, the result of the proceeding would have been
19 | different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient
20 | to undermine confidence in the outcome." *Id.* "In assessing prejudice under *Strickland*,
21 | the question is not whether a court can be certain counsel's performance had no effect on
22 | the outcome or whether it is possible a reasonable doubt might have been established if
23 | counsel acted differently. Instead, *Strickland* asks whether it is 'reasonably likely' the
24 | result would have been different. This does not require a showing that counsel's actions
25 | 'more likely than not altered the outcome,' but the difference between *Strickland*'s

27 |     [2] Respondent argues that Grounds One, Two, Four and Five are barred by
28 | procedural default. Because the claims fail on the merits, the court need not address procedural bars. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

7

prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'  The likelihood of a different result must be substantial, not just conceivable.'"  *Richter*, 562 U.S. at 112.

A court need not address both deficiency and prejudice if a petitioner makes an insufficient showing on one.  *Strickland*, 466 U.S. at 697.  "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105.

A.     **GROUND ONE:  <u>Inflammatory Remarks</u>**

To understand Petitioner's allegations in Ground One, one first needs to review the trial court proceedings.

**1.     Trial Proceedings**

During voir dire, defense counsel stated:  "[T]hat's another issue that's going to be coming up in this case, that Mr. Price was involved with drugs.  Some of it marijuana.  Some of it other drugs.  [¶]  Is there anyone here who thinks, well, someone who is involved with drugs must be dishonest?" (LD 15 at 52.)  Two jurors responded.  In questioning the second juror, defense counsel asked:

> You're going to hear some evidence that Mr. Price delivered
> drugs to an individual, that individual chose to pay him with a
> check, someone he had dealt with before.  He said okay.  I'll
> take the check.  The checks turned out to be not good.  [¶]  Do
> you think that there's no way you could give Mr. Price a fair
> judgment of his credibility when he went to cash the check with
> his own I.D. because you think the transaction involved other
> illegal activity?

(*Id.* at 55.)  The second juror responded:  "I think it's wrong."  (*Id.*)  Both jurors were the subject of peremptory strikes.  (*Id.* at 58-59.)  Defense counsel later queried the next set of prospective jurors about drugs.  (*Id.* at 71-72.)

During opening statement, defense counsel stated:

> Lastly, you will hear from Mr. Michael Fleming, the individual
> who, in fact, drafted the Rovenstine Roofing checks and
> presented them to Mr. Price.  You will hear that he was addicted
> to methamphetamine, and that he didn't have money for drugs.
> You will hear that he is incarcerated in the county jail currently,
> because, at the same time he was handing checks to Mr. Price,
> he was going around town to all the grocery stores and handing
> them checks from his own personal banking account in order to
> get groceries for his wife and baby, . . . but you will hear from
> the man who wrote the Rovenstine Roofing checks that, in fact,
> he gave them to Mr. Price in exchange for drugs because he
> didn't have any money and, in fact, he's engaged in this same
> behavior at other times.

(*Id.* at 315-16.)  The court then instructed the jury:  "So I notice that while the attorneys were making opening statements, some of you took notes in your notebooks. Remember, what is said is not evidence.  Evidence begins now, so don't confuse it."  (*Id.* at 316.)

Defense counsel sought appointment of counsel for Fleming.  (*Id.* at 417.)  Defense counsel stated that he represents Fleming in a another case.[3]  "When I became aware that he was related to [Petitioner's case], we discussed it and he feels bad that [Petitioner] is looking at 25 years for these checks."  (*Id.*)  Fleming "is prepare[d] to go forward and admit his wrongdoing, understanding there could be criminal ramifications, but since we can't get immunity, I think it is safest if we have independent counsel advise him."  (*Id.*)

---

[3]  Defense counsel represented that he had signed conflict waivers.  (LD 15 at 642.)

9

1    The court appointed counsel (Mr. Wells) for Fleming.  (*Id.* at 639.)  Mr. Wells spoke

2    to Fleming and represented to the court that Fleming wanted to testify.  (*Id.* at 640.)

3    At that point, the prosecutor stated he was concerned about "potential appeal

4    issues" based on defense counsel's opening statement.  (*Id.* at 640.)  "[I]t sounds like the

5    defense is going to be that Mr. Price received these checks in payment for selling illegal

6    narcotics.  So, basically, in an effort to defend this felony case, he would be basically

7    presenting evidence that he committed a different felony offense.  [¶]  I am not exactly

8    sure what constitutes ineffective assistance of counsel in the eyes of an appellate court,

9    but it sounds to me like that line of defense is problematic, to say the least.  So I just want

10   to make sure that if that is the nature of the evidence that is anticipated coming forth from

11   Mr. Fleming . . . I want to make sure that Mr. Price is aware of that and consents to that

12   line of defense."  (*Id.* at 640-41.)  Defense counsel responded:

13            I would respond initially by saying Mr. Price has been notified in

14            writing of the presentation of the defense that the checks were

15            taken in payment for illegal activities, specifically drug dealing, is

16            risky.  Further, we need to probably discuss this a little bit

17            further, and I don't know that we could get it all knocked out right

18            now and get back on the record.

19   (*Id.* at 641.)  Defense counsel was thinking of a way "for some evidence to be admitted

20   through Mr. Fleming that could be argued without admitting everything."  (*Id.*)  "[B]ut I

21   need to go see Mr. Fleming, I need to speak to Mr. Price, and, you know, I will definitely

22   be ready to go back on this issue tomorrow morning."  (*Id.* at 641-42.)  The prosecutor

23   advised that he could make a motion to amend the information to add a narcotics charge.

24   Petitioner addressed the court directly and asked whether he could file a motion to sever

25   the charge.  (*Id.* at 642.)  The court advised that the prosecutor "would ask to amend and

26   conform to proof, which you could object to, and then I would have to rule on it, and there

27   would be a lot of legal arguments made whether I should allow it or not.  [¶]  [Defense

28   counsel] is correct; generally, those are granted, a motion to amend that conforms with

10

1  proof.  With it being a new crime, I honestly don't know how I would rule because I don't

2  know – it is very unusual." (*Id.* at 643.)  The court stated:

3                  All that [the prosecutor] and [defense counsel] are trying to

4                  accomplish here is that it is clear that this is a defense you want

5                  to present.  [Defense counsel], I think, is of the opinion that it is

6                  not something you should try at this point – correct me if I am

7                  wrong, [defense counsel] – but I think he is putting on this

8                  defense because that's what you want.  [¶]  Is that right,

9                  [defense counsel]?

10  (*Id.*)  Defense counsel responded:

11                  Well, your honor, . . . a defense lawyer describing what they

12                  want, versus having to acquiesce to the desires of the client,

13                  and then I want to do the best I can with that, is a kind of

14                  ethereal plane where you mix your will and the will of the

15                  defendant.  So beyond that, I really don't have a statement on

16                  that, but Mr. Price is now fully aware of the risk, and we need to

17                  have a discussion about it before we make a decision to go

18                  forward.

19  (*Id.* at 643-44.)  Petitioner argued that "we started the trial about one case and he wants

20  to add a separate crime itself to a case while we are in the middle of trial." (*Id.* at 644.)

21  After some interjections, defense counsel explained that this situation is different because

22  the potential narcotics charge "is stemming specifically from the facts of this case.  So it

23  would be far more appropriate to have it charged and heard by the same jury because the

24  drug charge would stem specifically from the facts of this case and literally from a hand

25  transaction, drugs handed over, bad check taken.  So the reasons to have it heard by the

26  same jury are much stronger and legally justified." (*Id.*)  Petitioner responded: "Actually,

27  the check wasn't handed over.  You sound like the prosecution against me."

28  (*Id.*)  The court reminded Petitioner that the court had not decided how it would rule on

such a motion.  "We are just telling you this is a possibility, and [defense counsel] is going to talk to you about it."  (*Id.*)

No further discussion was conducted on the record about this issue.  Defense counsel called Fleming as a witness.  (*Id.* at 920.)  Fleming testified that he went to Petitioner to "arrange some kind of loan" after being paroled from prison.  (*Id.* at 921.)  Petitioner gave him a loan of $5000, which Fleming used to get things that he, his wife and children needed.  (*Id.* at 922.)  In June, Petitioner asked for his money back.  (*Id.*)  Fleming gave Petitioner three forged checks with Rovenstine Roofing but did not tell Petitioner they were forged.  (*Id.* at 922-24.)  On cross examination, Fleming testified that he had known Petitioner for about two months in 2009 and had seen him twice since getting out of prison in May 2010.  (*Id.* at 927-28.)  He did not know Petitioner to have a job.  (*Id.* at 930-31.)  Petitioner loaned him $5000 cash in $100 bills.  Fleming was supposed to pay it back in about a month.  (*Id.* at 928-29.)  Fleming denied that the loan had anything to do with drugs or illegal activity.  (*Id.* at 929-30.)  Fleming acknowledged that he gave Petitioner three forged Rovenstine Roofing checks that were made out to Petitioner for the same amount.  (*Id.* at 931-32.)  Fleming physically handed over the checks to Petitioner outside the apartment where he and Shane Stiles made forged checks, but Petitioner never went into the back room where the equipment was located.  Petitioner asked whether the checks were going to clear, and Fleming responded that "they have a correct account number" and, as far as Fleming knew, the checks were going to clear.  (*Id.* at 933-35.)  Petitioner did not ask why Fleming was handing him Rovenstine Roofing checks and did not ask if the checks were forged.  (*Id.* at 934.)

### 2.   State Court's Decision

The California Supreme Court and California Court of Appeal summarily denied the habeas petitions.  (LD 9, 11.)  Looking through the summary denials, the Superior Court denied the habeas petition on the grounds that Petitioner had not shown deficiency or prejudice.  (LD 7 at 7-8.)  "[I]t is obvious that his attorney was aware of such facts and developed a particular defense strategy in light of the poor facts with which he was faced.

Consequently, in anticipating bad facts to be brought up at trial he wanted to find sympathetic and unbiased jurors.  It also appears that this was the strategy at one point in time, prior to voir dire, and discussed with the Petitioner who then acquiesced."  (*Id.* at 8.)

### 3.   Analysis

Petitioner argues that his counsel's remarks were inflammatory in that (1) he described Fleming as a liar; (2) he informed Fleming to give "false testimony" that "petitioner was given fraudulent checks to repay a loan"; and (3) he caused jurors to be prejudiced against Petitioner before they heard any evidence.  (Traverse at 18-19.)

Petitioner's allegation that defense counsel told Fleming to testify falsely or told Fleming to give any particular testimony is wholly unsupported in the record.  Petitioner provides no testimony, declaration or other evidence from Fleming, defense counsel or anyone else.  On the contrary, defense counsel requested appointment of counsel for Fleming.  The trial court granted the request and, therefore, Fleming had other counsel (Mr. Wells) before his trial testimony.  (LD 15 at 417, 639-40.)

Petitioner's argument that defense counsel described Fleming as a liar, untrustworthy and a fabricator is also wholly unsupported.  Petitioner cites to defense counsel's opening statement about Fleming, which is quoted above.  However, defense counsel's opening statement nowhere describes Fleming as a liar, fabricator or untrustworthy individual.  (LD 15 at 315-16.)

Petitioner cannot show prejudice.  The prosecution did not argue that Fleming's testimony was incredible.  The prosecution's closing argument relied upon Fleming's testimony to show that Petitioner knew the three Rovenstine Roofing checks were illegitimate.  The prosecutor cited Fleming's testimony that (1) Petitioner asked whether the checks would clear, which the prosecutor argued supported an inference that Petitioner suspected the checks were not good; and (2) Petitioner received from Fleming three checks made out to Petitioner from a business with which Petitioner had no affiliation.  (LD 15 at 951-52.)  In rebuttal, the prosecutor again argued to the jury that it

1 could assume Fleming's testimony was true and find that Petitioner had the requisite
2 intent.[4]  (*Id.* at 987-88.)

3       Moreover, the evidence of Petitioner's guilt was strong.  With respect to the
4 Rowenstine Roofing checks, Petitioner attempted to cash and/or deposit the three checks
5 at three different branches of the same bank on two consecutive days, June 21-22, 2010.
6 Two of the checks bore the same check number.  In addition, Petitioner attempted to
7 conduct debit card transactions with nonsufficient funds on the same account.  The
8 prosecution presented expert testimony that there was no reasonable explanation for this
9 activity other than a pattern of fraud.  (*Id.* at 401-04; *see id.* at 357-61, 366-68, 383-87.)
10 Petitioner cannot show a "reasonable probability that, but for counsel's unprofessional
11 errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at
12 694.

13       Petitioner argues that defense counsel's remarks in voir dire about drugs inflamed
14 the jury against him before they heard evidence.  The state court reasonably found that
15 defense counsel anticipated that facts about drugs could come out at trial and attempted
16 to find jurors who could nonetheless be fair to Petitioner.  Two prospective jurors whose
17 responses suggested they might not be fair to Petitioner were the subject of peremptory
18 strikes.  (LD 15 at 58-59.)

19       As Petitioner argues, Fleming ended up denying that his transaction with Petitioner
20 involved drugs.  However, in connection with the fraudulent South County checks, Deputy
21 Foster testified that when he talked with Petitioner during his investigation, Petitioner
22 indicated he received the checks for "illegal activity and did not want to provide much
23 information."  (*Id.* at 349.)  Petitioner received the checks from Shannon for "illegal
24 services that he had done."  (*Id.* at 353-54.)  Petitioner commented that when you keep
25 up this type of activity, eventually you will be arrested.  (*Id.* at 352, 354.)  Thus, the jury
26 heard testimony that Petitioner was involved in illegal transactions, albeit not specifically

27

28      [4]  On Petitioner's motion for new trial, the court noted that Fleming "was a really
good witness."  (LD 15 at 1813.)

1   drugs.  Petitioner has not shown a reasonable probability that, but for counsel's alleged

2   error, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.

3        The state court's decision was not contrary to, or an unreasonable application of,

4   clearly established federal law and was not an unreasonable determination of the facts.

5   Ground One does not warrant habeas relief.

6        **B.   GROUND TWO:  Officer Lopez**

7        Petitioner argues that defense counsel erred in calling Officer Lopez as a witness

8   at trial.  According to Petitioner, defense counsel called Lopez to "show another person

9   committed the same act as Petitioner, the officer was aware and didn't charge him."

10  However, "[t]he officer's testimony was to the contrary."  (Petition at 5.)

11       Defense counsel explained that South County checks were cashed by Petitioner

12  and Mr. Chronister at the same market.  However, there is no supplemental incident

13  report from Officer Lopez indicating prosecution of Mr. Chronister.  (LD 15 at 409-10.)

14  Defense counsel intended to argue to the jury that the failure to prosecute Chronister

15  undermined the allegation of intent against Petitioner.  (*Id.* at 410-11.)  "I think it is a

16  legitimate defense argument to attack the credibility of the investigation of the defendant

17  and the integrity or thoroughness of the investigation of the defendant."  (*Id.* at 413.)

18       Officer Lopez testified at trial.  Mr. Chung of Pocketbook Market reported in

19  January 2010 that Petitioner had attempted to cash an invalid check that day and that

20  Petitioner and Chronister had previously cashed invalid checks on December 14, 2009.

21  (*Id.* at 630-32.)  Chronister was in custody on a different parole violation.  (*Id.* at 635.)

22  Officer Lopez did not interview Chronister but forwarded the information to a detective for

23  follow-up.  Lopez did not know whether Chronister was interviewed or whether Chronister

24  was charged by the prosecutor.  (*Id.* at 635-36.)

25       The Superior Court rejected this ground.  The court noted that defense counsel

26  explained his strategy on the record.  Although "[i]n hindsight," the strategy might not

27  have been the best, the court found no deficiency or prejudice.  (LD 7 at 7-8.)

28

1    The state court's decision was not contrary to, or an unreasonable application of,

2    clearly established federal law and was not an unreasonable determination of the facts.

3    Officer Lopez was called for an impeachment purpose that was not central to the

4    evidence against Petitioner.  Defense counsel argued the point only briefly in closing

5    argument.  (LD 15 at 970.)  Ground Two does not warrant habeas relief.

6        **C.    GROUND THREE: Petitioner's Failure to Testify**

7    Petitioner argues that defense counsel was ineffective and the trial court erred in

8    denying Petitioner the right to testify.  (Petition at 5.)  Petitioner states he informed

9    defense counsel that he wanted to take the stand during cross examination of Fleming.

10   (*Id.* at 6.)  Defense counsel completed his redirect examination of Fleming and rested

11   without calling Petitioner as a witness.  After closing arguments, defense counsel moved

12   to reopen to allow Petitioner to testify, and the court denied the motion.  (*Id.*)

13       **1.    Trial Court Proceedings**

14   At trial, the court put on the record that:  "I think it was after [the prosecutor] had

15   begun his argument, or maybe he finished his opening; I am not sure – [defense counsel]

16   advised [the prosecutor] and I in the hallway, out of the presence of the jury, that

17   [Petitioner] wanted to testify and/or argue his own case."  (LD 15 at 1211.)  The court

18   asked defense to "give us those facts" on the record.  (*Id.*)  Defense counsel stated:

19           Well, your honor, once [the prosecutor] began his closing

20           argument, [Petitioner] indicated to me that he didn't understand

21           that the defense case had rested and there would not be any

22           other testimonial evidence introduced at this point.  He

23           expressed the fact that he had formed an intent to testify that

24           had not previously been there; it was not our trial strategy, but

25           he had definitely formed that intent, and I guess I didn't hear him

26           or wasn't aware that he had formed the intent that he did want to

27           offer testimony, and I rested our case and the people began

28           their closing arguments.

16

1          In the alternative, he asked the court that – I asked the
2     court if he could then argue the case on his own.  I explained to
3     him that the court rejected this, and I also explained to
4     [Petitioner] that, even if he was able to argue the case on his
5     own behalf, he would not be able to bring up the subjects that he
6     wanted to offer into testimony if he was allowed to take the
7     stand.  He would only be allowed to address the evidence that
8     was already in the record, and it did not include the subjects he
9     wanted to testify about.  At that point, he permitted me to make
10    my closing argument.

11  (*Id.* at 1211-12.)  The court confirmed it denied the request that Petitioner argue his case

12  because he was not representing himself and the request was untimely.  (*Id.* at 1212.)

13        After the jury returned its verdict, Petitioner requested to represent himself and the

14  court granted the request.  (*Id.* at 1502-03.)

15        Petitioner filed a motion for new trial.  Petitioner stated as follows:  "On October 22,

16  2010 after Michael Richard Fleming testified for the defence, [Petitioner] informed

17  defence counsel . . . that it was his wish to testify on his own behalf by stating 'looks like

18  im going to have to take the stand now because it's the only way I can clean this mess

19  up! I know it wasn't the original plan but you have to put me on'.  As trial proceeded,

20  [Petitioner] noticed that the District Attorney was starting his closing arguments so the

21  defendant once again explained to his counsel that it was his wish to take the stand.

22  Counsel for the defence explained that it was not the original plan and that it was now too

23  late but he would see what he could do.  [¶]  In chambers with the D.A. present, defence

24  counsel explained to the Court that it was his clients wish to take the stand and requesed

25  that defendant be allowed to do so but the request was denied."  (LD 17 at 223.)

26        The trial court denied the motion for new trial.  (LD 15 at 1806.)  The trial court

27  found that Petitioner had the right to testify but failed to exercise it in a timely fashion.

28  Petitioner argued that he made the request to testify to defense counsel before closing

arguments.  The trial court responded that defense counsel had made no statement that Petitioner's argument was true.  The court called a recess and permitted Petitioner and defense counsel to confer.  (*Id.* at 1806-07.)  After the recess, defense counsel made the following statement to the court:

> Regarding [Petitioner's] request to testify, I have a recollection that on the last day of evidence, during the testimony of Michael Fleming, on cross-examination, he had contradicted a date very specifically.  On direct, I believe he testified he had gotten out of prison in May, middle of May.  He borrowed money from [Petitioner], and [Petitioner] came to collect it in the middle of June, and then on cross-examination, he answered [the prosecutor] that he was dealing with [Petitioner] about repayment around the first of July.
>
> [Petitioner] does turn to me then, during the cross-examination, and says, "this is a mess."  We were whispering, because we were on the record in front of the jury.  I remember him saying, "this is a mess," and I assured him we could redirect and, as I recall, that's exactly what we did.  I pointed out to him that he said the date differently on cross than he did on direct, and he agreed with me that that's true and that it was the middle of June and not July 1st when he was paying [Petitioner] with those checks that he had forged.
>
> I was under the impression that that handled it.  As a lawyer, I thought that Mr. Fleming, other than being in orange and admitting his prior, was a composed witness.  I thought that the direct had went exactly as I had planned, and once I stood up to redirect him on the date, that is the only thing I thought that

was messy, and I sat down, and I don't believe there was recross on Mr. Fleming.

There was not any more talk at that point between me and [Petitioner], because I believed we took a break right after Mr. Fleming left the stand.  We took a short break, we came back, and then [the prosecutor] stood up to start arguing, and I don't know how long he was talking – I don't know if it was more than a minute or less than a minute, but it became – [Petitioner] then contacted me and said, "I need to testify.  I need to testify."

I informed him that we had already closed the case – I think before the break when Mr. Fleming left the stand – and that I would ask the court if we could reopen and [Petitioner] could testify.

After he was done closing, we went into the hallway.  I informed the court that he wanted to testify.  The court said it was untimely.  I informed the court that he wished to fire me as his lawyer and conduct the closing argument himself.  The court said that was untimely.

* * *

So I would say it is possible that [Petitioner] had said something else about him – he might have tried to whisper something else about him wanting to testify in order to clean up the mess, but I didn't hear it.  I knew it was messy, that he had misstated or contradicted himself about the dates, whether it was the middle of June or the first of July, but I thought that had all been cleared up on redirect, and I had no idea [Petitioner], at that point, wanted to testify, not when we got back from the break.

The first time I became aware of it was after [the prosecutor] had already launched into his closing arguments, but he did say something to me toward the end of Mr. Fleming's cross-examination about it being a mess, and I was still trying to listen and take notes to keep track of what I might have to redirect on.  If he said something about "I have to take the stand in order to clean up the mess," I didn't hear that part of it.

(LD 15 at 1808-10.)  Petitioner responded as follows:

. . . He misunderstood on what mess I was talking about, whenever the D.A. was asking about why I was owed $5,000, and it is kind of a hard question.  Why would I?  When I was incarcerated those 32 months, I had a daughter.  My daughter was born while I was in prison, and I didn't want to see the same thing happen to Mr. Fleming, and I wanted to convey that to the jury.  Whenever I explained that to [defense counsel], he was in the middle of saying that he's got it covered.  He thought I meant just the mistake in dates.

. . . Whenever I saw the D.A. start to give his closing arguments, I asked him what was going on, that I wanted to testify, and it wasn't an untimely request the first time.

(*Id.* at 1810-11.)

The trial court found that the request to testify was untimely.  (*Id.* at 1811.) Separately, on the issue of Petitioner's intent, the trial court concluded that Fleming "was a really good witness" and "was believable."  "I just don't think the jury felt that it mattered whether you loaned him money or not.  The fact remains that, at the end of the day, it was very clear to me that you had no basis to think you could cash those checks and, as [the prosecutor]  pointed out, it was made out to look as though you worked for the company."  (*Id.* at 1813.)

## 2.    State Court's Decision

On direct appeal, the California Court of Appeal rejected Petitioner's claim that the trial court erred in refusing to reopen the trial to allow him to testify.  2012 Cal. App. Unpub. LEXIS 3433, at *5-*8.  The court found that Petitioner made the request to the court after the prosecutor had begun closing argument.  The evidence Petitioner proposed to offer was not significant.  "Fleming testified the loan was made for a legitimate purpose.  He needed the money to improve his family's living situation. [Petitioner's] proffered testimony would only confirm Fleming's uncontradicted testimony as to the legitimacy of the loan.  Moreover, the material issue in the case was not whether the loan was for legitimate purposes; it was whether [Petitioner] knew the checks were forged.  As to Price's knowledge, the evidence was overwhelming."  *Id.* at *7-*8.

## 3.    Subclaim – Trial Court Error

Petitioner does not cite any clearly established federal law requiring a trial court to reopen the evidence portion of a trial after closing arguments have begun when a defendant requests the opportunity to testify.  A state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law when there are no Supreme Court holdings on a particular issue.[5]  *Carey*, 549 U.S. at 77.

Moreover, in evaluating evidentiary rules, the Supreme Court has stated that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve.  In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify."  *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987). The right to testify must "bow to accommodate other legitimate interests in the criminal trial process."  *Id.* at 55.  "The exclusions of evidence that we declared unconstitutional in

---

[5]  The Ninth Circuit, on direct appeal from a federal conviction, has held that "a defendant must generally invoke the right to testify before the close of evidence."  *United States v. Orozco*, 764 F.3d 997, 1001 (9th Cir. 2014) ("The right to testify, however, does not include an option to listen to the prosecution's final argument and then engage in rebuttal argument.").

those cases significantly undermined fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

California considers four factors in determining whether a trial court abused its discretion in denying a motion to reopen the trial:  "'(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.'" *People v. Jones*, 30 Cal. 4th 1084, 1110 (2003).  Petitioner has not shown that California's rules are arbitrary or significantly undermined fundamental elements of his defense. *Bailey v. Kirkland*, 377 Fed. Appx. 700, 701-02 (9th Cir. 2010) (state court's consideration of *Jones* factors is not unreasonable application of federal law).  The state court reasonably found that Petitioner's proposed testimony about his reasons for the loan was at best cumulative of Fleming's testimony that the loan was legitimate and did not address the critical issue of whether Petitioner knew the checks were forged.  This subclaim of Ground Three does not warrant habeas relief.

### 4.    Subclaim – Ineffective Assistance of Counsel

As discussed above, the Superior Court concluded that Petitioner had failed to show prejudice from any claim of ineffective assistance of counsel.  Petitioner's proposed testimony concerning his reasons for making the loan to Fleming was at best cumulative of Fleming's testimony and did not address the issue of whether Petitioner knew the Rovenstine Roofing checks given to him by Fleming were invalid.  This subclaim of Ground Three does not warrant habeas relief.

### D.    GROUND FOUR:  Failure to Investigate

Petitioner contends that defense counsel was deficient for failing to interview the Rabobank manager and Roger Feldtmose.  Petitioner argues that their testimony would have been relevant to Petitioner's lack of knowledge that the South County checks were fraudulent.  The Superior Court found no deficiency or prejudice.  (LD 7 at 7-8.)

Deborah Love, the volunteer executive director of South County, a nonprofit, testified that she made all of the deposits and paid all of the bills for the organization.  (LD 15 at 602-04.)  Love was the only person who wrote the checks but she did not sign the checks.  A board member would sign the checks.  (*Id.* at 604.)  On November 30, 2009, South County was burglarized.  The safe, which contained the checks, was taken.  (*Id.* at 605.)  Love identified the checks marked as exhibits as checks that were stolen in the burglary.  (*Id.* at 607-10 (exhibits 1-6, 10-12).)  Love did not make or authorize any checks to Petitioner and did not know him.  (*Id.* at 606-10.)  The signature on all of the checks was similar to the signature of Roger Feldtmose, vice president of the Board for South County.  (*Id.* at 611.)

According to police reports attached by Petitioner in his state habeas petitions, an officer indicated:  "I spoke to Roger Feldtmose.  I showed Feldtmose the copy of the check.  He said the signature was similar to his, but he does not know [Petitioner] nor did he write the check to [Petitioner]."  (Exh. Q to LD 8; Exh. R to LD 10.)

The defense called Officer Langstaff as a witness.  Langstaff testified that in January 2010 he executed a search warrant at the home of Shannon Hanson and found South County checks among other things.  (*Id.* at 913-14.)  Langstaff took a check to Rabobank in Arroyo Grande.  (*Id.* at 915.)  Langstaff, after refreshing his recollection with his report, testified that the check was okay according to the bank.  (*Id.* at 917.)  Langstaff did not contact South County.  (*Id.* at 918.)

The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law and was not an unreasonable determination of the facts.

Assuming that defense counsel did not contact Feldtmose, there is no indication his testimony would have been helpful.  Love testified that she made out all of the checks for South County and did not make or authorize any check to Petitioner.  The police report of an interview with Feldtmose similarly indicated that Feldtmose did not know Petitioner and did not write a check to him.  Petitioner has not shown a "reasonable probability that, but

1  for counsel's unprofessional errors, the result of the proceeding would have been

2  different."  *Strickland*, 466 U.S. at 694.

3      Petitioner concedes that he does not know the name of the Rabobank manager.

4  (Traverse at 22.)  Petitioner contends that he contacted someone at Rabobank after

5  being told at Pocketbook Market that South County was not a real business.[6]  The

6  unknown Rabobank employee verbally verified that South County was a real business

7  and had an account at the bank.  (*Id.* at 22.)  Petitioner has not shown any deficiency or

8  prejudice.  The undisputed evidence at trial indicated that South County existed and had

9  an account at Rabobank.  Moreover, defense counsel did call Officer Langstaff, who

10  testified that a check found in Hanson's home was okay after contacting Rabobank.

11  Petitioner could not show a reasonable probability that the result of the proceeding would

12  have been different.  *Strickland*, 466 U.S. at 694.

13      In Petitioner's Traverse, he argues that defense counsel failed to subpoena

14  Shannon Hanson.  (Traverse at 23.)  Petitioner is incorrect.  Defense counsel stated on

15  the record that he hand delivered a trial subpoena to Shannon Hanson.  (LD 15 at 414-

16  15.)  The trial court would not allow defense counsel to put her on the stand so that she

17  would invoke the Fifth Amendment in front of the jury.  Therefore, defense counsel

18  requested a jury instruction that she had been subpoenaed but was unavailable.  (*Id.* at

19  415; *Id.* at 416 ("She's been very clear she has nothing she would be prepared to say.").)

20  The jury was instructed that defense counsel served a trial subpoena on Shannon

21  Hanson but she was unavailable to testify at trial.  (LD 17 at 121.)

22      Ground Four does not warrant habeas relief.

23      **E.    GROUND FIVE:  CALCRIM 3406**

24      Petitioner argues that the trial court erred in instructing the jury with CALCRIM

25  3406 as follows:  "If you find the defendant believed that he had a right to cash the checks

26  ─────────────────

27      [6]  Mr. Chung of Pocketbook Market testified that he cashed one check for Petitioner
in December 2009 and the bank returned it to him.  (LD 15 at 617-20.)  Petitioner

28  returned two weeks later in January 2010 with another two checks.  Mr. Chung told
Petitioner that the check was a forgery and that he was calling the police.  (*Id.* at 623.)

1   at issue . . . and if you find that belief was reasonable, he did not have the specific intent

2   required for the crimes."  2012 Cal. App. Unpub. LEXIS 3433 at *5 n.2; (LD 17 at 122.)

3                    **1.    Subclaim – Trial Court Error**

4         On direct appeal, the California Court of Appeal held that the trial court erred but

5   found the error harmless.  "[B]ecause [Petitioner] was charged with specific intent crimes,

6   the mistake of fact need not be reasonable."  2012 Cal. App. Unpub. LEXIS 3433 at *5.

7   Nevertheless, the error was harmless because, as the state court succinctly stated:

8   "[Petitioner] passed numerous checks written on the accounts of businesses with which

9   he had no discernible connection.  When he was arrested for attempting to pass South

10  County checks, he did not express outrage or even surprise.  Instead, he admitted the

11  checks were 'criminal in nature,' and told the police, 'If you keep up this type of activity,

12  eventually you will be arrested.'  Most telling is that even after Price was arrested for

13  passing forged checks, he continued to pass forged checks.  No juror would conclude

14  that [Petitioner] may have believed any of the checks were valid."  *Id.*

15        "The only question . . . is 'whether [a jury] instruction by itself so infected the entire

16  trial that the resulting conviction violates due process.'"  *Estelle*, 502 U.S. at 72 (citation

17  omitted).  In making that determination, "[t]he instruction may not be judged in artificial

18  isolation, but must be considered in the context of the instructions as a whole and the trial

19  record."  *Id.* (citation and quotation marks omitted).  "[I]t must be established not merely

20  that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

21  violated some [constitutional right].'"  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

22  (1974).  "[W]e 'have defined the category of infractions that violate "fundamental fairness"

23  very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S.

24  342, 352 (1990)).

25        Instructional error is subject to harmless error analysis.  See *Hedgpeth v. Pulido*,

26  555 U.S. 57, 61 (2008).  An error is harmless unless it had a "substantial and injurious

27  effect of influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619,

28  638 (1993).  When a state court has conducted its own harmless error analysis under the

1 │ *Chapman* standard, that analysis is itself an "adjudication on the merits" that must be

2 │ analyzed for reasonableness under the AEDPA's deferential standard of review.  *See*

3 │ *Davis v. Ayala,* 135 S. Ct. 2187, 2198-99 (2015) (discussing *Chapman* and *Brecht*).  A

4 │ state court decision is not unreasonable if "fairminded jurists could disagree on [its]

5 │ correctness."  *Id.* at 2199 (quotation marks and citation omitted).

6 │      Petitioner argues that the error was not harmless because the jury hung on three

7 │ counts of forgery.  The jury hung on Counts 2, 7 and 8 based on three other South

8 │ County checks.  (LD 15 at 1227.)  Petitioner's argument is wholly speculative.  If anything,

9 │ the jury's inability to reach a verdict on those counts is consistent with the California Court

10 │ of Appeal's analysis of harmlessness.  For example, Count 2 was based on the first

11 │ South County check that Petitioner cashed at Pocketbook Market on December 18, 2009.

12 │ (LD 17 at 129.)  By contrast, Petitioner was convicted of the next two South County

13 │ checks he attempted to cash at the same Pocketbook Market on January 14, 2010.  Mr.

14 │ Chung testified that Petitioner presented Exhibit 11.  Mr. Chung refused to cash Exhibit

15 │ 11 as a forgery.  Petitioner then presented Exhibit 12.  Mr. Chung said he was calling the

16 │ police.  Petitioner asked him not to call the police and took off.  (LD 15 at 622-24.)

17 │      The state court's decision was not contrary to, or an unreasonable application of,

18 │ clearly established federal law and was not an unreasonable determination of the facts.

19 │ This subclaim of Ground Five does not warrant habeas relief.

20 │ **2.    Subclaim – Ineffective Assistance of Counsel**

21 │      Petitioner argues that defense counsel failed to object to the erroneous language in

22 │ CALCRIM 3406.  Petitioner cannot show a reasonable probability that the result would

23 │ have been different for the same reasons discussed above in connection with harmless

24 │ error.  *Strickland*, 466 U.S. at 694.

25 │      Petitioner incorrectly argues that defense counsel failed to object to CALCRIM 373.

26 │ CALCRIM 373 was given over defense counsel's objection.  (LD 15 at 1208-11.)

27 │

28 │

**V.**

**ORDER**

For the foregoing reasons, IT IS ORDERED that judgment be entered denying the Petition on the merits with prejudice.

DATED: February 22, 2017

_____
ALICIA G. ROSENBERG
United States Magistrate Judge